NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0292n.06

Case No. 20-6126

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jun 17, 2021
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| LISA VITTETOE, Individually and as Next of Kin of Deceased Jason Adam Myers,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>BLOUNT COUNTY, TENNESSEE; JAMES L. BERRONG, Sheriff, JOSEPH DEWAYNE ATKINS, Individually,<br><br>    Defendants-Appellees. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE<br><br>OPINION |

BEFORE: STRANCH, BUSH, and READLER, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Jason Myers died from drug and alcohol intoxication after spending the night in the Blount County jail. His mother, Lisa Vittetoe, sued Blount County, its sheriff, and the on-duty intake officer for excessive force and wrongful denial of medical care. The district court granted summary judgment to the officer on qualified immunity grounds and dismissed the claims against Blount County and the sheriff for failure to state a claim. Finding no error, we affirm.

I.

Because this appeal is of a grant of one defendant's summary-judgment motion and other defendants' motion to dismiss, we review based on different sets of facts: the grant of summary

judgment on the record evidence, described in section A, and the motion to dismiss on the facts as alleged in the amended complaint, set forth in section B.

A. FACTUAL BACKGROUND

In September 2016, Jason Myers was arrested after a fight with his father. Officers noted that Myers smelled of alcohol and was slurring his speech. They brought him to the Blount County jail around midnight and made the corrections staff aware that he was intoxicated.

Joseph Atkins was one of the intake officers on duty that night. He explained that the officers did not take Myers's fingerprints or picture because Myers was intoxicated. Instead, the officers gave Myers the opportunity to sober up before completing the intake process. At some point, he fell asleep in the cell. Around 1:45 a.m., Atkins checked on Myers because someone commented on how he was snoring. Atkins found that Myers was breathing and snoring loudly but appeared in no distress. Then, around 3:45 a.m., Atkins and the on-duty magistrate tried to wake Myers for arraignment but were unsuccessful: Myers did not respond to verbal commands and continued to snore loudly. Later, Atkins and the magistrate twice more attempted to wake and arraign Myers with no success.[1]

Around 4:30 a.m., another inmate, Ishmael Patterson, was placed in Myers's cell for about forty-five minutes. Patterson later said that Myers was snoring a little but that he could tell the "dude was dying." No other inmates shared the cell with Myers. Atkins returned to the cell around 4:50 a.m. to check Myers's heartbeat because he was still snoring loudly and not responding to verbal instructions. Although Atkins could not get a reading from a medical device because Myers's fingers were too cold, he found by hand that Myers had a "strong and steady" pulse of about eighty-five.

---

[1] Atkins noted only one attempt to arraign Myers, but the magistrate stated, and the security-video footage confirms, three attempts.

At 5:00 a.m., Atkins began serving the inmates breakfast. When it was Myers's turn, he again did not respond. So Atkins, after finishing feeding the other inmates, called for a nurse to do a vitals check. At around 5:30 a.m., Atkins and Nurse Kathy Bishop entered Myers's cell, and Bishop conducted the vitals check. She found a pulse of about eighty-eight, respirations of about seventeen to eighteen, and slightly low blood pressure. Bishop told Atkins that she would keep an eye on Myers until she finished her shift. About ten minutes later, when Atkins informed another officer of the situation, the officer, Atkins, and Bishop again checked on Myers, and Bishop again found his pulse to be normal. Then, around 5:45 a.m., Atkins left to respond to another inmate and, at about 6:00 a.m., was relieved by the day shift. He informed the day shift of Myers's situation.

At around 6:20 a.m., Bishop received a call from intake that Myers was unresponsive. When she checked on him, she could not detect that Myers was breathing or find a pulse. Additional help was called, including Ryan Palonis. Bishop, Palonis, other officers, and paramedics attempted to resuscitate Myers by performing chest compressions, attaching an IV, and administering Epinephrine. Palonis noted that Myers's "lips were blue indicating cyanosis and red and clear fluids were coming from his mouth and nose indicating that he had aspirated." Myers was transported to a local hospital. Around 7:00 a.m., he was pronounced dead. His autopsy indicated that the main cause of death was drug and alcohol intoxication.

B. Amended Complaint Allegations

The amended complaint tells a slightly different story. According to that pleading, Myers showed no signs of intoxication and did not smell of alcohol when the police officers arrested him. He was placed in a cell with at least five other inmates. Around 3:00 a.m., one of those inmates called for an officer because Myers was barely breathing. Then around 4:00 a.m., Atkins spoke

on his cell phone, saying something like: "You might want to come check him. Can't get him to roll over off his arm. Maybe that's why it's turning blue. He's blue around the mouth." Despite that statement and the inmates' continued calls for help, Atkins displayed no sense of urgency. Around 5:00 a.m., another inmate was placed in the cell with Myers and could tell that Myers had been beaten. And there was blood on the wall by Myers. At some point, a nurse attempted to take Myers's pulse seven times. Later, around 6:00 a.m., Atkins exited Myers's cell and said: "I need help and I need help now." Then officers removed Myers from his cell, and one inmate commented, "You need to do CPR," and another, "I think we just witnessed a murder, because we called out for two hours." Atkins responded: "shut the **** up, or I'll beat you." Then Myers was taken to the hospital and pronounced dead on arrival.

### C. PROCEDURAL BACKGROUND

Following Myers's death, his mother, Lisa Vittetoe, sued Blount County, Sheriff Berrong, Atkins, and others for claims including excessive force and wrongful denial of medical care. The district court granted summary judgment to Atkins and dismissed the claims against Blount County and Sheriff Berrong. Specifically, it held that Atkins was entitled to qualified immunity on both claims because the record showed that he did not use any force on Myers and was not deliberately indifferent to his medical needs. It further held that the official-capacity claims against Sheriff Berrong were redundant with those against Blount County and that the amended complaint failed to allege sufficient facts to show that any Blount County employee violated Myers's rights or that the county had an unconstitutional policy or custom.

Vittetoe appeals each holding, arguing that the district court erred in granting summary judgment to Atkins and in dismissing the claims against Blount County and Sheriff Berrong. She also argues that the district court erred in not striking Blount County and Sheriff Berrong's motion

to dismiss because they violated the court's standing order to meet and confer prior to filing such a motion.[2] We consider each argument in turn.

## II.

### A. ATKINS

We begin with Vittetoe's arguments that the district court erred in granting summary judgment to Atkins for qualified immunity. Atkins has qualified immunity if he did not violate a constitutional right that was clearly established at the time of the alleged violation. *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020). And summary judgment is appropriate when there is no genuine dispute of a material fact. Fed. R. Civ. P. 56(a). That occurs when no reasonable jury could find for the nonmoving party based on the evidence. *Wright*, 962 F.3d at 864. We review the grant of summary judgment de novo, construing the evidence and drawing reasonable inferences in Vittetoe's favor. *Id.*

Vittetoe advances two constitutional claims against Atkins: first, that he used excessive force against Myers, and second, that he was deliberately indifferent to Myers's medical needs. Because Myers was a pretrial detainee, Vittetoe's claims fall under the Fourteenth Amendment. *Griffith v. Franklin County*, 975 F.3d 554, 566–67 (6th Cir. 2020).

#### 1. Excessive Force

To prevail on an excessive-force claim under the Fourteenth Amendment, Vittetoe must show that Atkins purposely or knowingly used objectively unreasonable force against Myers. *Moderwell v. Cuyahoga County*, 997 F.3d 653, 661 (6th Cir. 2021). Naturally, force must be used

---

[2] In addition, Vittetoe argues in passing that the district court erred in denying her an opportunity to amend her complaint again, in staying discovery during the pendency of Atkins's motion for summary judgment, and in staying the case during disciplinary hearings regarding one of her counsel. But she does not develop those arguments. Vittetoe lists the first as an issue on appeal without discussing it later in her brief. She mentions the second two only in passing. Each is therefore forfeited. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 396–97 (6th Cir. 2016).

before it can be objectively unreasonable.[3]  But there are no facts in the evidentiary record that suggest Atkins used any force against Myers.  In his declaration, Atkins states that he "never used any force whatsoever" and knows of no one who used force on Myers during his incarceration. The other officers' declarations all similarly state that no one used force against Myers.  So too does the on-duty magistrate's.  And Patterson, the inmate who shared a cell with Myers for part of the night, did not witness any force.  In addition, the security video, which displays the intake area and outside Myers's cell, gives no indication that force was used on Myers.

The record offers no support for Vittetoe's allegations that an inmate placed in Myers's cell around 5:00 a.m. could tell Myers had been beaten and that there was blood on the wall by Myers.  Indeed, the record reveals that Patterson was the only inmate placed in Myers's cell and no one noted or confirmed blood being on the wall.  Similarly, Vittetoe's suggestion that minor or alleged inconsistencies in the record indicate a cover up of the use of force is simply not reasonable. For example, she points to only Palonis noting signs of cyanosis and aspiration and Atkins noting only one attempt at arraignment when three occurred.  But those minor or alleged inconsistencies have nothing to do with the use of force and fail to suggest a cover up.

Instead, the only possible combination of evidence in the record that could remotely support Vittetoe's contention that Atkins used force against Myers is that Myers did not show signs of physical injury when he was arrested but the autopsy showed minor physical injuries.  That, however, is still insufficient to allow a reasonable jury to conclude that Atkins used force against Myers because it is inconsistent with all the concrete evidence in the record and amounts to mere

---

[3] In *Moderwell*, we noted that an excessive-force claim does not necessarily require an allegation of an assault but "can consist of the physical structure and conditions of the place of detention."  997 F.3d at 662 (quoting *Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir. 2002)).  In other words, if an officer subjects an inmate to certain physical conditions without assaulting him—such as forcing him to lie down in a cold, muddy area, *see Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir. 1992), or to stay in a police car with the windows rolled up in ninety-degree heat for three hours, *see Burchett*, 310 F.3d at 945–46—excessive force can still occur.  But here Vittetoe argues only that Atkins himself used excessive force against Myers.  So for that type of force to be excessive, it must have first been used.

speculation. In short, the record does not present a dispute of material fact as to whether Atkins used force on Myers.

2. Deliberate Indifference

Turning to Vittetoe's deliberate-indifference claim, she must show two elements: that Myers objectively had a "sufficiently serious medical need" and that Atkins "possessed a sufficiently culpable state of mind in denying medical care." *Griffith*, 975 F.3d at 567–68 (quoting *Winkler v. Madison County*, 893 F.3d 877, 891 (6th Cir. 2018)). Atkins does not contest the first element, but Vittetoe cannot show the second.

Traditionally, we have defined a sufficiently culpable mind as one that subjectively "knows of and disregards an excessive risk to inmate health or safety." *Winkler*, 893 F.3d at 891 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). But recently, we have questioned whether *Kingsley v. Hendrickson*, 576 U.S. 389, 395–97 (2015) requires us to apply an objective test. *See, e.g.*, *Griffith*, 975 F.3d at 569–70. We have not yet had to answer that question and need not do so here: because Vittetoe did not raise the issue presented by *Kingsley*, she has forfeited it.[4] *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016). So we apply the subjective test.

Atkins knew that Myers was intoxicated when Myers came to the jail. And as the night progressed, he became concerned that Myers's condition was more serious. But there is no indication that Atkins knew that Myers's condition posed an excessive risk or that he recklessly disregarded that risk. Each time Atkins had cause for concern he responded reasonably. When someone made a comment around 1:45 a.m. about how Myers was snoring, Atkins checked on him. He then checked on Myers several additional times with the magistrate. When Atkins

---

[4] Atkins's brief notes that we have yet to apply the objective test from *Kingsley* to a deliberate-indifference claim. Vittetoe did not file a reply brief and did not raise the issue in her original brief, so she has failed to preserve any argument for application of *Kingsley* to her deliberate-indifference claim.

became concerned that Myers was still not responding to verbal instructions around 4:45 a.m., he checked Myers's pulse and found it normal. Then, after Myers still would not respond when Atkins attempted to serve him breakfast, Atkins called for a nurse to do a vitals check. The nurse did the check and another check about ten minutes later after Atkins reported the situation to another officer. The checks did not show that Myers was in distress, and the nurse told Atkins she would keep an eye on Myers. Finally, Atkins informed his replacing officer of the situation at the end of his shift.

Nothing in that sequence of events indicates that Atkins disregarded an excessive risk to Myers's health or safety. Instead, he repeatedly checked on Myers and then relied on the nurse's judgment that Myers was not at risk, as he was entitled to do. *See Winkler*, 893 F.3d at 895 (explaining that the officer was not deliberately indifferent because he was entitled to rely on a doctor's judgment). Those facts do not present a material dispute as to whether Atkins knew that Myers's medical needs posed a significant risk or that he recklessly disregarded that risk. Under the subjective test, therefore, he did not possess a sufficiently culpable state of mind to be deliberately indifferent.

Nor is it reasonable to infer that Myers was deliberately indifferent based on the slight or alleged inconsistencies in the record. Vittetoe points to several such inconsistencies. For example, she notes that Atkins only mentioned one attempt to arraign Myers when three attempts occurred. That Atkins made two additional attempts to arraign Myers, however, does not suggest he should have known that Myers's condition posed a serious medical risk or was reckless in disregarding that risk. Similarly, Vittetoe notes that Palonis is the only person to state that Myers had signs of cyanosis and aspiration. But that likewise does not suggest Atkins was deliberately indifferent because, based on the record, it is not a reasonable inference to make that Atkins saw those similar

signs and simply ignored them. In sum, neither those, nor any of the other alleged inconsistencies to which Vittetoe points, raise a genuine dispute of a material fact as to whether Atkins was deliberately indifferent. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986))).

B. BLOUNT COUNTY

Next, we consider Vittetoe's argument that the district court erred in dismissing her claims against Blount County. As a preliminary matter, she contends that the court erred by not striking Blount County's motion to dismiss because the county did not meet and confer with her as required by a standing order. That order stated that if a party filed a motion to dismiss that did not contain a certification indicating that the parties had met and conferred prior to its filing, then the motion was "subject to being stricken on the court's motion." Vittetoe is correct that Blount County did not meet and confer prior to filing its motion to dismiss, which made the motion subject to being struck. She is, however, incorrect that "subject to being stricken," means "must be stricken": the court retained discretion whether to strike. It did not err in declining to exercise that discretion.

Vittetoe also argues that the district court erred in dismissing her claims against Blount County for failure to state a claim. We review the dismissal de novo, construing the amended complaint in the light most favorable to her and accepting its factual allegations as true.[5] *West v.*

---

[5] That is so despite the material in the record from Atkins's motion for summary judgment because the district court did not convert Blount County's motion to dismiss into one for summary judgment. *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (explaining that we ordinarily assess the factual sufficiency of a complaint without looking outside the pleadings, but if we do look outside them, we treat a motion to dismiss as one for summary judgment). The court did, however, incorporate its earlier ruling that Atkins did not use force against Myers and was not deliberately indifferent to his medical needs as the law of the case. We need not determine whether that was proper because even without incorporating the ruling the amended complaint fails to state a claim against Blount County, as discussed below.

*Ky. Horse Racing Comm'n*, 972 F.3d 881, 886 (6th Cir. 2020). To survive dismissal, those factual allegations must directly or indirectly support "all material elements necessary for recovery under a viable legal theory." *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Phila. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013)). Legal conclusions "masquerading as factual allegations" and "conclusory allegations," however, are insufficient. *Id.* (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

The district court held that the Blount County could not be liable for the excessive-force and deliberate-indifference claims because of its prior holding on summary judgment regarding Atkins combined with its finding that the amended complaint did not allege any other officer committed acts against Myers that would support those claims. We have noted that it is an open question in our circuit whether a county can be liable if a plaintiff fails to establish that an individual defendant violated a constitutional right. *See Griffith*, 975 F.3d at 581. We need not resolve that question here.

Blount County can be liable only if it itself committed a constitutional violation; it cannot be vicariously liable for its employees. *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020). And it could commit that violation only if it has a policy or custom that caused the injury in question. *Id.* Vittetoe can demonstrate that Blount County had such a policy or custom, at the motion-to-dismiss stage, by alleging facts that show one of the following circumstances: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.*

Case No. 20-6126, *Vittetoe v. Blount County, Tenn.*

(quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). The amended complaint fails to adequately plead any of them.

First, that pleading provides no facts to support its allegation that Blount County had an official policy that caused officers to use excessive force against Myers or to be deliberately indifferent to his medical needs. To be sure, it makes the following allegations: "[b]ecause of the policies, practices, customs, and procedures of the Blount County Sheriff's Office, [Myers] was intentionally deprived of his Constitutional right to be free from excessive force and deliberate indifference to his needs"; "Berrong enacted policies and procedures approved by Blount County which violated [Myers's] clearly established rights"; "[t]he policies or customs established and endorsed by Blount County and the Blount County Sheriff's Office were a cause of the injuries suffered by [Myers]." But each of those allegations is conclusory—they are legal conclusions "masquerading as factual allegations"—and is therefore insufficient to plead a claim. *D'Ambrosio*, 747 F.3d at 383 (quoting *Terry*, 604 F.3d at 275–76). Nowhere in her amended complaint does Vittetoe describe an official Blount County policy or show how that policy led to the alleged constitutional violations.

Second, the amended complaint fails to allege that an official with final decision-making authority ratified any of the alleged illegal actions constituting excessive force or deliberate indifference. There is no allegation, not even those regarding Sheriff Berrong, that comes close.

Third, the pleading does not adequately allege facts to show the existence of a policy of inadequate training or supervision. It alleges that Myers "was subjected to unnecessary, abusive and negligent force because of the failure of Berrong and Blount County to train, monitor, supervise, control, assign, counsel, investigate, and discipline," and that Sheriff Berrong

"intentionally or negligently failed to train and supervise on the proper circumstances under which force can be used." But again, those are legal conclusions.

Fourth, and finally, the amended complaint does not adequately allege the existence of a custom of tolerance of or acquiescence in federal rights violations. The allegation that Sheriff Berrong "intentionally or negligently failed to properly and completely investigate allegations of the improper use of force, and attempted to cover up serious injuries and deaths to citizens because of the use of negligent force or intentional misuse of force by his subordinates" is conclusory. Similarly, insofar as a custom of tolerance can be shown by a custom of inaction, the amended complaint fails to allege sufficient facts. Among other things, to show a custom of inaction, Vittetoe must allege a "'clear and persistent pattern' of unconstitutional conduct" by employees. *Id*. at 387 (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)). That she did not do. Vittetoe alleged only that "[f]ailing to promulgate and implement such procedures, policies, or customs caused the perpetuation of procedures, policies, or customs leading directly to deliberate indifference to [Myers's] needs and causing his death."

In sum, the amended complaint fails to adequately plead that Blount County had a policy or custom that caused Myers to be subjected to excessive force or deliberate indifference. Therefore, the district court did not err in dismissing the claims against the county.

C. SHERIFF BERRONG

Finally, we consider Vittetoe's argument that the district court erred in dismissing the claims against Sheriff Berrong. The court held that those claims were official-capacity claims, redundant with those against Blount County. That is correct.

We assume that a government official is being sued in his official capacity, unless the pleadings provide notice that he is being sued individually. *See Moore v. City of Harriman*,

272 F.3d 769, 772 (6th Cir. 2001) (en banc). When a plaintiff "fails to affirmatively plead capacity in the complaint, we then look to the course of proceedings to determine whether" the official has notice. *Id.* at 773. Here, Vittetoe affirmatively pleaded capacity in the amended complaint for her claims against Atkins, explicitly noting that she was suing him in both his official and individual capacities, but she did not do so for those against Sheriff Berrong. So we apply the course-of-the-proceedings test for those claims.

That test "considers such factors as the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability." *Id.* at 772 n.1. It also considers subsequent pleadings if they are filed in the early stages of litigation. *Id.* In *Moore*, we held that the official was put on notice despite the complaint not affirmatively pleading capacity because the caption did not list the officers' titles, referred to them throughout as the "individual defendants," had language indicated they were acting for themselves, and requested damages against each defendant. *Id.* at 773. In addition, the plaintiff's response to the officer's motion to dismiss, which we assumed was at an early stage of the litigation, clarified that the plaintiff was suing the officers in their individual capacities. *Id.* at 774.

Unlike in *Moore*, the amended complaint does not indicate that Vittetoe sued Sheriff Berrong in his individual capacity. It lists his official title in the caption, contains no language indicating an individual-capacity claim against him, and simply requests damages in general. In addition, Sheriff Berrong did not raise any qualified immunity defense in response to it. And most tellingly, the amended complaint does not state Vittetoe is suing him in his individual capacity after explicitly doing so for Atkins. Finally, unlike in *Moore*, Vittetoe's response to the motion to

dismiss was not at an early stage of the litigation. It came almost two years after the proceeding began, well after the amended complaint, and after the district court's summary-judgment ruling. Sheriff Berrong therefore did not receive notice from the course of the proceedings that he was being sued in his individual capacity. *See Shepherd v. Wellman*, 313 F.3d 963, 969 (6th Cir. 2002). Given that lack of notice, the district court correctly determined that Vittetoe sued Sheriff Berrong in his official capacity.

Official-capacity suits are treated as suits against the applicable governmental entity. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). So the official-capacity claims against Sheriff Berrong are equivalent to those against Blount County. Because the district court did not err in dismissing the latter claims, it similarly did not err in dismissing those against Sheriff Berrong. *See Baar v. Jefferson Cnty. Bd. of Educ.*, 476 F. App'x 621, 636 (6th Cir. 2012).

## III.

Accordingly, we affirm the judgments of the district court granting summary judgment to Atkins and dismissing the claims against Blount County and Sheriff Berrong.